# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| THOMAS KENNEDY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. |

**DECLARATION OF THOMAS KENNEDY IN SUPPORT OF RULE 41(g) MOTION**

I, Thomas Kennedy, declare as follows:

1. I am the Plaintiff in the above-captioned action and am over the age of 18. I have personal knowledge of the matters herein and am competent to testify regarding these matters. The statements set forth in this declaration are true and correct, to the best of my knowledge and belief.

2. I am U.S. Citizen and Miami resident. I am a PhD student at Florida International University where I work as a research assistant and study immigration and surveillance.

3. I have a significant public presence. I have 94,000 followers on Twitter (now X) and 24,000 on Instagram. I regularly post my thoughts and opinions on social media, and I share news articles. My social media posts are political and often touch on U.S. immigrants' rights issues or foreign policy. I regularly do interviews with the media—I speak to European, Latin American, and Florida news outlets on a daily basis about immigration policy. I also do freelance writing for newspapers and some academic writing for journals.

4. For almost 10 years, I have worked with the Florida Immigrant Coalition ("FLIC"),



Doc ID: e1b661156f1f60956808c3c52198c3d157969e47

an immigrants' rights nonprofit. I am currently their Policy Consultant, and I work on communications, setting up press conferences, ghost-writing, media appearances about policy on behalf of FLIC, among other things. I've played a key role in several anti-detention campaigns in Florida, as well as other immigration and immigrants' rights policy campaigns. I'm a member of multiple coalition groups, where we regularly discuss our ongoing policy advocacy. These discussions cover strategy, planning, and research.

5. I recently contributed to an Amnesty International report on Alligator Alcatraz that focused in part on the use of a small cage that detainees were being held in. My communications with Amnesty International staff took place over email, which is saved on my phone.

6. I also work frequently with the Community Justice Project ("CJP"), a non-profit law firm in Florida. Often, I collaborate with CJP on developing civil rights lawsuits, particularly finding potential plaintiffs. My text threads, social media accounts, and email accounts are the main methods that I use to express my viewpoints, engage in work, and communicate, associate, and engage with the larger immigrants' rights and civil rights community.

7. All of my work communications are saved in text apps or as email attachments on my phone: this includes conversations with news sources; drafts of largescale investigatory reports; coordinating legal support and discussing legal issues; drafts of legal documents; conversations with highly confidential personal client information; and multiple group text conversations around strategy and implementation of different immigrants' rights policy campaigns. It is also the main way that I communicate with friends, family, and loved ones. There is a significant amount of personal and professional information on my cell phone.

8. On September 6, 2026, I flew into Miami International Airport ("MIA") from Istanbul, with a layover in Cairo. I had spent 11 days traveling in Egypt and Turkey for vacation.



Doc ID: e1b661156f1f60956808c3c52198c3d157969e47

I got to customs at around 9:30 pm, and I scanned my U.S. passport at the customs kiosk scanner. It flagged me immediately. At that point, a U.S. Customs and Border Protection ("CBP") agent came up to me and told me I had to go with him for secondary inspection.

9. I asked him multiple times why I was being detained, and he told me CBP has the right to detain me at the port of entry. I told the agent that I'm a U.S. citizen and asked him if he could just tell me what the issue was. The agent refused to and said that he didn't have to tell my anything, and it did not matter that I was a U.S. citizen.

10. The agent took me to a waiting room that had around six other people waiting.

11. After approximately 10 minutes, a CBP agent took me to a smaller room and told me to sit down. The agent asked me the following questions: Why were you traveling? Why were you there? What do you do for a living?

12. I didn't give them information about my work, but I told them I worked at a nonprofit. One agent asked me more questions about work, but I didn't answer. The CBP agent then asked me for my phone. I refused. He told me that I had to give him my phone, and I refused again.

13. The CBP agent then left the room and returned with another CBP agent. The second agent asked me again for my phone, and I refused again. These agents then took me to another room with a large table on it and told me to put my bags on the table. They then looked through every piece of my luggage. They examined everything I had with me. They checked inside the pockets of all of my clothing. In my bag I had two books, <u>The Palestine Laboratory: How Israel Exports the Technology of Occupation Around the World</u> and <u>King of Kings: The Iranian Revolution: A Story of Hubris, Delusion and Catastrophic Miscalculation</u>, and a few vintage Egyptian magazines that I bought during my trip.



Doc ID: e1b661156f1f60956808c3c52198c3d157969e47

14. A CBP agent picked up King of Kings and asked me a series of questions, including, “What is this book and why do you have it?,” “Why is there a U.S. and Iranian flag on it?,” “Is this about the old or new Iran?,” and “Why are you interested in Iran?”

15. I didn’t offer an explanation about my books, as I didn’t understand what they had to do with why I was being detained. When I told the agents I wasn’t going to talk about my books, the agent picked up the vintage magazines and asked, “Why do you have these pamphlets?”

16. I told him that they weren’t pamphlets, they were magazines, and I thought they looked cool and I bought them. They asked again why I had them, and I answered the same way since it was the truth. A CBP agent gathered the books and magazines. I asked why he was taking them, but he didn’t respond. He left the room and then returned without them. I’m pretty sure they scanned the books and the magazines.

17. Then, the other CBP agent told me he needed my phone. I refused again. He threatened me, saying that if I didn’t give him my phone, my interrogation was going to take much longer and they could retain my phone indefinitely.

18. I felt like I had no choice, so I handed my phone to the CBP agent.

19. The CBP agents started putting my belongings back in the bag, and I asked if I could do that. They hesitated but agreed. My things had been spread all across the table during the agents’ inspection. The agents took me back to the waiting room.

20. Shortly thereafter, one of the CBP agents came back and said, “So what is it you do for a living? Are you some kind of immigration lawyer? Is there anything on your phone that could be attorney-client privileged?”

21. I told the CBP agent that I wasn’t an immigration attorney, but that my phone very likely had attorney-client privileged information, so please be careful. The agent walked away.



Doc ID: e1b661156f1f60956808c3c52198c3d157969e47

22. After waiting for about 45 minutes, the agents came back and said they were going to let me go. I asked if I could get my phone back, and they said yes and returned it to me, along with my books and magazines. I believe that they copied some or all of my phone data when they took my phone from me.

23. None of the CBP agents ever told me why they were detaining me, why they were questioning me, why they confiscated my reading materials, or why they confiscated my phone—despite my repeated questions. I didn't fill out any forms. I was given a one-page boilerplate document about CBP's right to search luggage but no receipt, case number, or anything that was specific to me, my property, or my secondary inspection.

24. As described earlier, my phone has several social media, text messaging apps and email apps, both for work and personal use. I talk to clients, I talk to colleagues, I talk to coalition members—all on my phone. The conversations are saved on the phone and contain highly sensitive and private information. I sometimes connect people with attorneys at CJP and other legal organizations and law firms. I also have a lot of work conversations, where I discuss investigations, reports, legal issues and sometimes draft legal documents. I have hundreds of email attachments that have legal information and other sensitive work information. I was logged in to my social media, text messaging, and email apps at the time of the seizure.

25. I believe CBP flagged me because of my organizing and political work around immigrants' rights in Florida. This isn't the first time that law enforcement targeted and harassed me because of my political viewpoint: in 2021, after speaking out against Governor DeSantis, the Miami Police were surveilling me and barring me from press conferences. I sued the Governor in 2022 for violating my First and Fifth Amendment rights.

26. I believe CBP targeted me for secondary inspection and confiscated my phone as



Doc ID: e1b661156f1f60956808c3c52198c3d157969e47

punishment for my political opinions and immigrants' rights work. I'm a U.S. citizen who was traveling for pleasure. I was stopped because of my outspoken criticism of the Trump Administration and my work securing immigrants' rights. I find it alarming that I had already been flagged by CBP's database before I even entered customs at MIA. CBP shouldn't have been able to confiscate my phone, let alone copy its contents. I believe they did so to suppress my political speech.

27. I worry about what the government is doing with my data, clients' data, my privileged conversations, and my legal work products. I'm afraid that they've copied and disseminated the data, which could harm me and my colleagues.

28. The longer that CBP has my data, the greater the likelihood that they'll review or share confidential or privileged information. I don't want to put myself or others at risk. The only way to mitigate that risk is for CBP to return or delete all the data it extracted from my phone.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 24, 2026

Thomas Kennedy

Thomas Kennedy
*Plaintiff*